**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FOUZIA RETAMOZO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  1:21-cv-01652 |
| | ) | |
| v. | ) | Hon. Matthew F. Kennelly |
| | ) | |
| U.S. BANCORP d/b/a U.S. BANK, | ) | |
| | ) | |
| | ) | Magistrate Judge Heather K. McShain |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM FILED IN RESPONSE TO DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

Plaintiff, Fouzia Retamozo ("RETAMOZO" or "PLAINTIFF"), by her attorneys Gaffney

& Gaffney PC, for her Memorandum Filed in Response to Defendant's Motion for Summary

Judgment and In Support of Plaintiff's Motion for Partial Summary Judgement on Defendant's

Affirmative Defenses, states:

I.      **Factual Statement**

A.   **Facts Supporting Plaintiffs Failure to Accommodate Claim.**

In September, 2017, Plaintiff provided Defendant's HR Representative Donna Shriver a

letter which provided, in part, "I or a family member was a victim of domestic or sexual violence

and I need to take time off to attend my VESSA related needs." Plaintiff also referenced the need

to "recover from my physical or psychological injuries and attend medical follow-up

appointments." That same information was provided to Plaintiff's manager, Gregory Cromwell

on December 15, 2017 (PSOF 1*)*. On January 8, 2018, Plaintiff corresponded with Defendant's

---

* PSOF= Plaintiff's Statement of Facts

1

HR Representative Donna Shriver starting with "I need your help on something" and in that communication conveyed the fact that she was "still healing from a major calamity involving my six-year-old daughter." Plaintiff further stated that she can't afford to be even more "stressed out while I am healing" including with "I ask for a little leniency in regards to accommodations while healing." (PSOF 2). In a similar June 2018 communication to Shriver Plaintiff again asked for her assistance stating in part that she was "recovering from a major calamity" and "dealing with many pieces of my case, which takes much out of me with a young seven-year-old still relying on me to heal her" (PSOF 3). In August, 2018, Plaintiff communicated with her manager, Greg Cromwell stating that "I requested an accommodation for the BOB with our HR partner through a personal circumstances around my VESSA leave and my recent miscarriage." (PSOF 4). In late September, 2018, Plaintiff notified her manager and HR Representative Donna Shriver that she had just applied for a leave of absence "to handle the grief of my recent miscarriage beginning 10/1/18." (PSOF 5). When Plaintiff needed to take time off, Greg Cromwell would ask his assistant Arnetta if they had any staffing and if her answer was no and if they did not have staffing, it was "too bad." Cromwell would not allow Plaintiff to take time off when needed unless she used sick time or vacation time. Plaintiff was discouraged not to take a medical leave and told that she was going to get fired which put her into further distress and full blown PTSD. (PSOF 119-120). Plaintiff struggled with Greg Cromwell and Donna Shriver to obtain any VESSA leave because she had not yet qualified for FMLA. Plaintiff testified that they would "not listen that VESSA was good for twelve weeks" further asserting that as a result she became extremely stressed and setback in her healing. (PSOF 6). Plaintiff also testified that she was denied an assistant and sent an email stating that she had lost a baby and that she was extremely

---

DSOF= Defendant's Statement of Facts

exhausted, stressed with grief, without help and needed the accommodation with time off. (USB 6).

Plaintiff testified that she was not allowed to use her vacation time on an as needed basis instead of a full week at a time. Plaintiff told Cromwell that she needed time for her daughter and "our situation for healing" but Cromwell said "no" and Plaintiff also said she was denied a request to work Saturdays to fulfill her forty-hour commitment. (PSOF 8). Plaintiff also testified that Cromwell did not allow Plaintiff to go to appointments during the timeframe that her assistant Amanda was out of the office because the branch had no coverage and thus Plaintiff couldn't attend one or more doctor's appointments. (PSOF 9).

On February 23, 2019, Plaintiff emailed Donna Shriver stating that she was looking for an alternate solution to take time off for healing "as my daughter & I are still recovering from major trauma." Plaintiff notified Shriver that her prior FMLA leave was "in an effort to heal a bunch of wounds I never dealt with", stating further that her daughter was diagnosed with PTSD and that she had "secondary PTSD based on an adjustment disorder to all the trauma involved." Plaintiff concluded with "I hope and pray you can work with me as I care about my job" stating further that both her and her daughter were in counseling and that her health and sanity were being tested further stating "so if you can somehow guide me and work with me… I would really appreciate it." (PSOF 11).

On April 20, 2019 Plaintiff sent an email to her current manager, Deborah Zegger, HR Partner, Joan Kulovitz and HR Donna Shriver with the subject "accommodation request" stating in part that the work incident on April 18, 2019 "has triggered my PTSD heavily." On May 22, 2019, Plaintiff's psychologist submitted a written statement to Defendant stating that Plaintiff had been under her care since November 2018 and concluding with the statement that Plaintiff

could return to work as of June 3, 2019 and "she will continue to attend psychotherapy sessions related to the incident as needed." (PSOF 13) Prior to returning from workers' compensation leave, there were times when Plaintiff could not attend doctor's appointments or counseling appointments on behalf of her daughter (PSOF 120). In July, 2019, U.S. Bank demanded that Plaintiff no longer request any additional accommodations for medical leave because Plaintiff had used her FMLA up even though Plaintiff needed to see the doctor for PTSD. (PSOF 23). On July 16, 2019, Plaintiff submitted an email to HR Partners Zegger and Kulovitz specifically requested an accommodation to handle her PTSD under the Americans with Disabilities Act. (PSOF 14).

Plaintiff's psychologist, identified Plaintiff's daughter within her health statement because Plaintiff's own disabling condition had become worse based upon the fact that her daughter's accommodation was never met in the first place saying that the failure of the bank to accommodate Plaintiff's child caused Plaintiff "great disability". (PSOF 21 ). Despite Plaintiff's request, Defendant denied Plaintiff's request for flexibility on various rules. Plaintiff was a salaried employee but not allowed to work on Saturdays so as to make up time missed due to appointments but instead had to use any accrued sick time until it ran out with her manager stating that "we don't get paid for Saturdays." (PSOF 8).

Plaintiff received sarcastic comments from her manager Deborah Zegger to the effect that she was "always gone" and that she would "hide behind doctor's notes." (PSOF 70, 119). After Plaintiff returned from her first leave of absence in 2019, HR Partner Joan Kulovitz did not like that Plaintiff asked for an accommodation for her daughter stating that it was unnecessary telling Plaintiff that "we did enough, we did a lot. How dare you ask we have not done enough." (PSOF 31). Plaintiff was required to use up all of her vacation or sick time to personally get treatment

until she ran out. Plaintiff also tried to make up for hours missed by working on Saturdays but was told by her boss not to record hours on Saturdays because they don't count so she was forced to use her accrued vacation or sick days instead (PSOF 8,22).

### B. Facts Supporting Plaintiff's Claim that Her Termination Violated the ADA and FMLA

Despite her medical problems and the need for leaves of absence, Plaintiff was a good performer receiving a rating of "meaningful" even though her branch was understaffed throughout most of the year 2019. (PSOF 42, 99). However, after some allegations opened an investigation by Emily Brooks-Lipor, Plaintiff's manager, Deborah Zegger used that opportunity to made multiple false and derogatory statements which were documented by Emily Brooks-Lipor within her investigation report. Under oath at her deposition, Zegger recanted and denied making most of those false statements documented by Brooks-Lipor. Within the Brooks-Lipor investigation notes of statements by Zegger, which Zegger denied under oath at her deposition, were statements that included "she was showing two of them nude pictures of her and her boyfriend"; "I'm getting a sense that she comes and goes whenever"; "she started coming in at 10:30 or 11"; "she seems to only be coming in four hours"; "it happens once or twice a week"; "my file on her is bigger than my entire file drawer"; "she comes and goes as she pleases and we cannot do anything"; "there is an interesting pattern as soon as she is eligible for leave she goes out again"; "I feel like she got a get out of jail free card when she transferred to me and when they tried to hold her accountable and she hides under these doctor's notes and says its too much stress"; "the doctor's appointments are always in the middle of the day"; "her appointments are always at 2:00 p.m."; "she is not doing good work"; "her desk was a hornet's nest"; "she is not doing her job"; "it was gross negligence but every time I do anything I cannot get anywhere, f

5

anyone else was doing this they would have been terminated"; "I think the bank is afraid of her"; "it is unbelievable"; "if they gave her an aptitude test she would not pass it"; "when she has leave time she immediately takes it"; "for what we are paying her she should be there"; "I constantly have to find people to cover her"; "I see a pattern here"; "I have plenty of people on leave and this is different. This is a pattern"; "I think HR just lets her come and go"; "When I cleaned out her desk there were four-five pending lawsuits from other companies"; "There is also a personal case that she has against someone else. She has all the paperwork in there. I have been in this game for a really long time and I have never seen anything like this and as a company we are just letting her do it."; "I just realized she was at one point suing the bank." But under oath at her deposition, Zegger denied making most of these statements or denied that the underlying facts were accurate. (PSOF 43, 44; Plaintiff's Exhibit 38, USB 822 – 826).

Plaintiff's Human Resources Representative Joan Kulovitz acknowledged that the bank had performance management policies which included verbal warning, written warning and action plans but Plaintiff received no discipline. (PSOF 45). Kulovitz was involved in Plaintiff's request for accommodations and leaves of absence and was assisted by Employee Relations Representative, Tina Vincelli (PSOF 46-47). Plaintiff vigorously pursued her rights and had a meeting with Kulovitz on September 5, 2019 to discuss Plaintiff's accommodation requests and VESSA rights. (PSOF 49-50). Kulovitz, after consulting with Vincelli, notified Plaintiff on multiple occasions that "we will be able to accommodate your request for one to two hours per week away from work to attend your own psychotherapy appointments." Kulovitz also repeatedly notified Plaintiff that she had "exhausted FMLA and Illinois State Leave including VESSA" . She was threated with  disciplinary action if she took any full or half days absence not approved or covered under one of the U.S. Bank's leave policies. (PSOF 18). Nobody ever

explained to Plaintiff how her VESSA rights were exhausted with the Hartford stating that it wasn't its responsibility to monitor VESSA and HR directing Plaintiff to communicate all of her leaves to Hartford, including VESSA leave. (PSOF 48).

Kulovitz also made multiple false statements about Plaintiff to Brooks Lipor including "Merima was also sent a naked picture." (PSOF 53). There is also a statement attributable to Kulovitz within the Brooks-Lipor investigation file where she is quoted as saying "Other things going on with her regarding performance stuff." When asked at her deposition what "performance stuff" she was talking about the only thing Kulovitz could say that was performance related was "requests for leave" . Kulovitz was not aware of any other performance concerns. (PSOF 53). At the end of the Brooks-Lipor investigation, the last conversation with Kulovitz was on March 26, 2020. (Plaintiff's Exhibit 38, USB 848). During that interview, Kulovitz talked about "stuff behind the curtain". Brooks-Lipor understood that to be the "medical curtain". Kulovitz then proceeded to make false statements which were documented by Brooks-Lipor including "she is out of the office more". Although Kulovitz said something about "one on one coaching" Kulovitz could not recall any concern in 2019 or 2020 regarding any issue with Plaintiff in one on one coaching. Kulovitz notified Brooks-Lipor that "DM frustrated" (District Manager Zegger). Zegger was frustrated with Plaintiff's leaves because she had to get coverage for the branch when Plaintiff was on leave. Kulovitz represented that "when the manager is not there - there still is frustration." Kulovitz said Plaintiff "doesn't always seem truthful about her request for leave" but when asked to support that statement at her deposition, she could not. No one had told Kulovitz that Plaintiff was being "less than truthful" regarding her leave status or request for leave. Brooks-Lipor quoted Kulovitz as saying "Will you get a direct answer from her, probably not," but Kulovitz acknowledged she had no recollection of any

time in her dealings with Plaintiff when she did not get a direct answer or have reason to believe that she was not given a direct answer. (PSOF 54; Plaintiff's Exhibit 38, USB 848).

Some of Plaintiff's subordinates worked in conjunction with Zegger and Kulovitz to disparage Plaintiff to Brooks-Lipor because they were frustrated with Plaintiff being out on FMLA leave or out of the bank for medical appointments. These employees made multiple statements to Brooks-Lipor that had nothing to do with code of conduct issues. Additionally, Brooks-Lipor continued to ask questions of these employees on matters unrelated to code of conduct issue but instead related to Plaintiff's leaves of absence and management. For example, Michael Barnes made a statement apprising Brooks-Lipor "she is very calculated" and stating that she sued the bank and she won, she has a lawyer that goes over documents a lot, she was gone for six months and then came back, she was out of the bank a lot and not in regular attendance, asserting that she is looking for "another lawsuit." (PSOF 64). Barnes also falsely represented to Brooks-Lipor that Plaintiff nude pictures Ramushi. (PSOF 65). Regarding the text message issue, Barnes acknowledged to Brooks- Lipor that he thought that it was "sent to the wrong person". (PSOF 66). In the Brooks-Lipor interview of Milicia Stojanovic of March 6, 2020, most of the questions to Brooks-Lipor and allegations of Stojanovic had nothing to do with any code of conduct violation but once again when Plaintiff is there, not there, or manages the branch. (PSOF 67).

Merima Ramushi who is a wealth management advisor intermittently at the bank branch, stated that her relationship with Plaintiff was "strictly business." Plaintiff never showed Ramushi nude pictures and she never saw pictures of Plaintiff in the nude which completely contradicted representations of Barnes, Kulovitz and Zegger. (PSOF 73). In regards to the Valentine's Day incident, Ramushi straightforwardly told Brooks-Lipor that Plaintiff was "shocked as everyone

else" with Plaintiff apologizing "I'm so sorry. I had no idea." Brooks-Lipor questioned Ramushi about being uncomfortable and her response was that she was uncomfortable with "his actions not hers." (PSOF 74). Brooks-Lipor acknowledged that Ramushi's statements created a credibility issue. (PSOF 75).

Brooks-Lipor acknowledged that based upon the interviews of Kulovitz and Zegger, there were many statements and concerns made that did not have to do with any code of conduct violation. (PSOF 77). Brooks-Lipor agreed that a person's intent is a consideration of what constitutes a code of conduct violation and Brooks-Lipor could not recall any evidence that Plaintiff sent the inappropriate text message to Barnes intentionally. (PSOF 78). Brooks-Lipor also acknowledged that in her final interview with Joan Kulovitz, many concerns were discussed unrelated to the ethics code violation and the only statement that Kulovitz made which related to a possible ethics code issue was "ask Merima about snapchat picture." (PSOF 94). Additionally, Brooks-Lipor acknowledged that Zegger expressed many concerns about Plaintiff unrelated to any alleged ethics code violation and that two other branch employees interviewed expressed at some length concerns with Plaintiff as a branch manager unrelated to the ethics code violation issue (PSOF 95). There was an acknowledgment by Brooks-Lipor that Kulovitz and Zegger were expressing frustration with Plaintiff with Zegger claiming that HR did not know how to handle or couldn't handle all that was going on leading up to Plaintiff's leaves of absence causing frustrations (PSOF 96).

Personal banker Michael Barnes acknowledged that despite what Kulovitz and Zegger said, he never reported Plaintiff for any misconduct and he did not know who reported Plaintiff after the Valentine's Day occurrence. (PSOF 107). Barnes acknowledged that he was personally frustrated with the handling of the branch without having a branch manager present and told

Kulovitz and Zegger of the frustration and discussed how Barnes handled branch business while she was out on leave providing details about the tasks that Barnes had undertaken at the branch as a universal banker including training other employees. (PSOF 108). Barnes spoke with Zegger around the same time that he was interviewed by Brooks-Lipor discussing how Plaintiff was also out of the branch on leave of absence and what his day-to-day activities were like when Plaintiff was not there. Zegger asked Barnes questions about the impact of the branch and employees during Plaintiff's absence. Barnes told Zegger why it was difficult to not have a branch manager present for extended periods of time. (PSOF 109-110). Barnes also admitted that he thought Plaintiff was "out to get money and finding a way to sue the bank." (PSOF 112).

Brooks-Lipor was not familiar with the workplace respect policy. (PSOF 57). There were many facts that Brooks-Lipor acknowledged that she never asked or found out. She never asked for or saw any pictures that were shown to Michael Barnes. (PSOF 60). Brooks-Lipor never watched the video but only saw still shots that were provided her (PSOF 62). She did not know that by 10:24 a.m. Plaintiff was out of her office walking in the lobby and talking to others on February 14. (PSOF 63). Brooks-Lipor only interviewed Plaintiff once but did not interview Plaintiff after she interviewed the other witnesses to get Plaintiff's response to their allegations. A review of the questions and answers Brooks-Lipor posed to all of the witnesses reveals that Brooks-Lipor heavily inquired regarding Plaintiff's alleged absenteeism and other possible managerial concerns which had nothing to do with any alleged code of conduct issue. Roughly eighty percent or more of the questions posed by Brooks-Lipor related to non-code of conduct concerns.

Brooks-Lipor was asked about fourteen other investigations that she made findings on. (PSOF 80-93). There is no evidence that any of those individuals requested a reasonable

accommodation under the ADA or requested FMLA leave. (PSOF 115). She did acknowledge that the code of conduct policy was applicable to all employees and that the employee's position with Defendant did not matter as the policy applied "to everyone". Brooks-Lipor stated that in performing investigations, she did not take into consideration the level of the person, who the manager is, the region or the job. (PSOF 58). Brooks-Lipor acknowledged that credibility of all persons involved in the investigation is a consideration and that in some of her investigations she found that credibility played a role (PSOF 59).

One investigation was unsubstantiated with Brooks-Lipor stating that there was not "specific evidence to substantiate allegations regarding specific remarks" which should be compared to Barnes allegation that Plaintiff was shown nude photos (PSOF 80). Another employee made a blatant and intentional text message to another employee about masturbating which Brooks-Lipor substantiated but only recommended coaching, verbal warning which should be compared to Plaintiff's unintentional vaginal rejuvenation text message. (PSOF 81). Two male bank employees engaged in inappropriate conversations in team meetings which were substantiated along with statements about clients on the tinder and the tinder mobile dating site with sexual innuendos with Brooks-Lipor recommending "coaching." (PSOF 82). Another employee made a statement to a coworker about a graphic sexual act. Two other employees heard about it but second hand and because there was a conflict between the claimant and the respondent, the charge was unsubstantiated without an additional witness verifying what was said or an admission by the respondent compared to the nude photo allegation of Barnes which was denied by Plaintiff. (PSOF 53). Another bank employee stated "I think we should have sex" along with other inappropriate conducts including throwing a stress ball at a female's butt and rubbing something on her back and then stating "my dick." These serious offenses were

substantiated. Another sexual remark by the same person was found unsubstantiated even though the respondent didn't deny it but said he couldn't recall it. Despite all of this, Brooks-Lipor made a recommendation of "final written warning" which pale compared to all of the allegations made against Plaintiff. (PSOF 84).

Brooks-Lipor found unsubstantiated an allegation of someone looking over a bathroom stall even though another witness said she experienced the same occurrence. (PSOF 85). Another branch manager made multiple remarks of a sexual nature and was also accused that he "touched my ass". Brooks-Lipor accepted the possibility that the ass touching was accidental asserting that an accidental act is not sexual harassment but ultimately found that other charges by female employees of a sexual and provocative nature were credible, straightforward and independently corroborated. As a result, that branch manager received a written warning to address appropriate conversations when interacting with other employees. (PSOF 86). Another employee stated to a female employee "come jump on my dick" which was substantiated resulting in a written warning. (PSOF 87). Another male employee told a female employee that when her boyfriend grabs her breasts she should slap him or stick her finger up his ass stating that her boyfriend would like it which was substantiated. Brook-Lipor did not substantiate another allegation where the same individual shouted out "real or fake" on the street after a happy hour event stating that there was a "discrepancy in statements" which resulted in a verbal warning. (PSOF 88). Another female employee made three other employees in the workplace uncomfortable for unwanted physical attention, touching of coworkers and also asking coworkers for personal favors with a finding of substantiated and a recommendation of "coaching" as a level of discipline. (PSOF 89). Another female employee made multiple statements of a sexual nature regarding her sexual preference as a bisexual, sleeping naked and other allegations of a similar nature. There was

corroborating evidence of a district manager who apprised Brooks-Lipor that he also had previously addressed a similar situation with the same employee. The allegations were substantiated with Brooks-Lipor recommending "a written warning." (PSOF 90). Another branch manager was accused of making inappropriate statements and belittling comments along with an allegation that the branch manager discouraged employees from going to HR or the district manager regarding concerns and that she retaliated against employees if they do report anything all of which was substantiated with a final recommendation of written warning. (PSOF 91). Another employee was found to have made inappropriate comment of a sexual nature but recommended "training" because the other employees seemed satisfied by the investigation and did not appear to be "an ongoing issue." (PSOF 92). Another employee engaged in inappropriate hugging and touching with one specific employee claiming that she was picked up on multiple occasions despite saying "don't do that," but he continued to engage in the same behavior. The allegations were substantiated and that employee was disciplined with "coaching." (PSOF 93).

## II.     Summary Judgment Standard.

The moving party bears the initial burden of identifying the portions of the record that it believes demonstrate the absence of a genuine issue of material fact and entitle it to judgment as a matter of law. *Id.* at 323;*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The court must view all of the evidence submitted in the light most favorable to the nonmoving party. *Adickes,* 398 U.S. at 157. "Because this is an employment case, highly dependent on issues of intent and the credibility of witnesses, we must apply these standards with 'added rigor.'" *Bultemeyer v. Fort Wayne Community Schools*, 100 F. 3d 1281, 1283 (7th Cir. 1995).

## III.    Plaintiff's ADA Failure to Accommodate Count I Claim

### A. Plaintiff provided adequate notice of a need for an accommodation prior to July in 2019.

When an individual decides to request accommodation, the individual or his/her representative must let the employer know that s/he needs an adjustment or change at work for a reason related to a medical condition. To request accommodation, an individual may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation." (*Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA*, EEOC- CVG, 2003-1, Issue Date 10/17/2002); C.E.G. See, e.g., *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997(D. Or. 1994) ("statute does not require the plaintiff to speak any magic words. . . The employee need not mention the ADA or even the term 'accommodation.'"). See also *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998) ("[a] request as straightforward as asking for continued employment is a sufficient request for accommodation"); *Bultemeyer v. Ft. Wayne Community Schs*., 100 F.3d 1281, 1285, (7th Cir. 1996) (an employee with a known psychiatric disability requested reasonable accommodation by stating that he could not do a particular job and by submitting a note from his psychiatrist); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998); *Bultemeyer v. Fort Wayne Cmty. Sch.,* 100 F.3d 1281, 1286 (7th Cir. 1996) (Bultemeyer may not have known that FWCS expected him to ask specifically for a "reasonable accommodation" particularly when the employee has a mental illness). The employer has to meet the employee half-way and if it appears that the employee may need accommodation but doesn't know how to ask for it, the employer should do what it can to help. *Id.* Also See, *Erickson v. Bd. of Governors of State Colleges & Universities For Ne. Illinois Univ.*, 1997 WL 548030, at *6–7 (N.D. Ill. Sept. 2, 1997) (Defendant argues that Erickson's failure to request an accommodation is dispositive of

14

the claim but *Bultemeyer* and the regulations doom this argument as this Court finds

that *Bultemeyer* applies with equal force to an infertile woman whose treatment causes emotional

distress that leads to insubordination. Mental health disabilities impose a heightened duty on

employers to begin the interactive process). *Walters v. Mayo Clinic Health Sys.-EAU Claire

Hosp., Inc.*, 998 F. Supp. 2d 750, 764 (W.D. Wis. 2014).

Here, Plaintiff made multiple requests, representations and statements which put

Defendant on notice that she was requesting an accommodation based upon her medical

condition. (See, PSOF 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, 15 and 119). Plaintiff made multiple

requests for accommodations prior to July, 2019 both on behalf of herself as well as her

daughter. Defendant's position is that this Court does not have jurisdiction over Plaintiff's

VESSA claim. True enough, but Plaintiff's mental health was in a large part tied to that of her

daughter's well-being (PSOF 6, 17,21). Plaintiff repeatedly reached out on her own behalf in

conjunction with assertion of state law VESSA rights. ADA accommodations includes all

"terms, conditions and privileges of employment." 42 U.S.C. §12112 (a). Once the employee

provides notice that she has a disability and requests an accommodation, the employer is

required to engage with the employee in an interactive process to determine the appropriate

accommodation under the circumstances. *Nehan v. Tootsie Roll Industries, Inc.*, 54 F. Supp. 3d

957, 975 (N.D. Ill. 2014). "The Seventh Circuit has only deemed an accommodation *per se*

unreasonable when the accommodation itself creates 'an inability to do the job's essential tasks.'

" *Wal-Mart*, 38 F.4th at 658 (quoting *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481

(7th Cir. 2017)). "Where an accommodation does not render an employee unable to do a job's

essential functions, ... then the default fact-based case-by-case approach to ADA claims is

appropriate." *Id.*

**B. Defendant's failure to accommodate in an appropriate interactive process or provide a reasonable accommodation.**

The reasonableness of a requested accommodation is a question of fact. *See Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 896 (7th Cir.1996). Under the ADA, "[o]nce an employer's responsibility to provide reasonable accommodation is triggered, the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996); see also 29 C.F.R. § 1630.2(*o*)(3); 29 C.F.R. Pt. 1630, App. § 1630.9. *Haschmann v. Time Warner Entm't Co.,* 151 F.3d 591, 601 (7th Cir. 1998). Plaintiff sought rule flexibility even before FMLA leave was available to her. Although Plaintiff didn't discover the ADA until July, 2019, she nevertheless made multiple ADA requests for accommodation by requesting Defendant modify its standard leave rules so that she could put in a full work week, attend to her own medical issues as well as those of her daughter and not be penalized by losing vacation and sick time. Defendant ignored Plaintiff's requests for flexibility. (PSOF 5, 6, 7). Greg Cromwell also denied Plaintiff the ability to go to one or more doctor's appointments during the timeframe that her assistant Amanda was out of the office. (PSOF 9). In the first half of 2019, Plaintiff was denied the opportunity to attend doctors' appointments or counselings for both her own PTSD and her daughter's situation. (PSOF 11, 12, 119, 120).. The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

**IV. Plaintiff Has Substantial Direct and Circumstantial  Evidence of ADA Disparate Treatment, ADA and FMLA Retaliation To Create a Triable Issue of Fact**

Defendant's Motion for Summary Judgment generally describes all three of Plaintiff's unlawful termination claims. The only element that Defendant asserts that Plaintiff cannot meet is the "but for" causation element. Defendant does not assert, because it cannot, that Plaintiff does not have a disability under the ADA, did not engage in ADA protected conduct or did not engage in FMLA protected conduct to warrant coverage under those acts. The only issue raised by Defendant is that of causation. Although there are many tests and rubrics for viewing discrimination claims, it is important to recall that, at the end of the day they are all merely convenient ways to organize our thoughts as we answer the only question that matters: when looking at the evidence as a whole, "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). [When the court is] evaluating this question in the context of [the defendant's] motion for summary judgment, [its] task is to look at the facts in the light most favorable to [the plaintiff] and determine whether [the defendant] is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022). The Ortiz court held that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." Id.

The Ortiz court noted that "[t]he burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 ... (1973), sometimes is referred to as an 'indirect' means

of proving employment discrimination." Id. at 766. *Onstott v. Equinox Gold Coast, Inc.,* 18-CV-4642, 2020 WL 6681366, at *3 (N.D. Ill. Nov. 12, 2020)

It remains an open question in this circuit the "but for" causation standard here. *Kurtzhals v. Cnty. of Dunn,* 969 F.3d 725, 728 (7th Cir. 2020) The proper causation standard under the ADA is a "motivating factor" test. This is consistent with the law of other circuits. "Under the ADA, 'discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision making process and have a determinative influence on the outcome.' *Pinkerton v. Spellings,* 529 F.3d 513, 517–19 (5th Cir. 2008). Accord, *Soledad v. U.S. Dept. of Treasury, 304 F.3d 500, 503–04 (5th Cir.2002) (citing Ahrens v. Perot Sys. Corp., 205 F.3d 831, 835 (5th Cir.2000)* for the proposition that to succeed in an ADA claim "discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision making process and have a determinative influence on the outcome"). *Egan v. Delaware River Port Auth.,* 851 F.3d 263, 274 (3d Cir. 2017)( We join our sister circuits in applying *Desert Palace* and holding that direct evidence is not required to obtain a mixed-motive instruction under the FMLA).

An FMLA Retaliation claim can be supported by both direct evidence (establishing a causal connection between the employee's FMLA leave and her termination) and indirect evidence (showing that the employee was treated less favorably than similarly situated employees who were not on FMLA leave). *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 633–635 (7th Cir. 2009) An employer may not consider the taking of FMLA leave as a negative factor in employment actions. 29 C.F.R. § 825.220(c); *King v. Preferred Tech. Grp.,* 166 F.3d 887, 891 (7th Cir. 1999).

18

Plaintiff's evidence, described above and within Plaintiff's statement of material facts established the causal link between Plaintiff's protected activities and the adverse action. First, Plaintiff herself experienced the proverbial cold shoulder after she returned from leave of absence from Manager Zegger, HR Kulovitz and even her staff. Plaintiff made observations that she no longer was in control of the branch and that her staff were being directed, behind the scenes, by Zegger. Second, there are direct adverse statements made to Plaintiff by both Zegger and Kulovitz displaying the adverse animus based upon the fact that Plaintiff continued to lawfully seek her accommodations under the law. Barnes was not offended by the text message he received or any photos that he saw, because he never reported it or the Valentine's Day incident that he recorded and said was "cute". But someone did, and then Barnes was then contacted by Zegger and Kulovitz. During that conversation, Barnes unleashed his sentiment against Plaintiff, not because of any purported code of conduct issue but rather on issues surrounding her absences and management. Barnes claimed to be running the store and deserved more credit or help. Kulovitz falsely reported that Barnes was the one that reported code of conduct issues. The investigation ensued which was grossly tainted a gross amount of disparaging comments by Kulovitz, Zegger and some of Plaintiff's staff. Most of the investigation surrounded Plaintiff's attendance and management with very little relating to any code of conduct issues. Near the end of the investigation, Kulovitz released a final barrage of statements degrading Plaintiff which had nothing to do with any code of conduct concern. When confronted at their depositions, both Kulovitz and Zegger folded their tent on allegations that Brooks-Lipor documented. All this, and more, not only establishes as a causal link to Plaintiff's protected activities but in addition thereto, pretext plus under a McDonnell Douglas analysis. Although Brooks-Lipor claims to have an honest belief in her recommendation, the evidence is

clear that she repeatedly solicited and received extensive information from all of her interview witnesses on Plaintiff's leave issues which had nothing to do with the code of conduct claims. If that information did not matter to her, she never would have asked question after question to solicit the biased opinions about Plaintiff and include them within her interview notes. The notes from her other investiagtions (PSOF 54-57, 59-61, 63-67, 69-70) display no such intrusive ink. If it really didn't matter, Brooks-Lipor would have told the witnesses, "that's not for me, that's to be reported to HR or Employee Relations as a managerial performance concern because I'm here to investigate the code concerns". Brooks-Lipor was clearly influenced by all this information and referenced it as a "performance concern" within the investigation summary. Tina Vincelli saw only the final summary and not the notes and she previously assisted Kulovitz on Plaintiff's accommodation requests. As stated by Vincelli, her job was risk management and she wanted to give the final summary "another set of eyes". The Brooks-Lipor recommendation was then forwarded to a bank Senior Vice President, Jennifer Barber-Uhri who approved termination "based on the conclusions of the investigation and guidance by H.R."(DSOF 76)*[†]. Since there is no evidence on what "guidance by H.R" means, a reasonable trier of fact would infer that the "guidance" Barber-Uhri received from "H.R.' was that same "guidance" of disparaging statements about Plaintiff because of her absences including false statements (PSOF 53-54; Plaintiff's Exhibit 38, USB 848).

---

[†] DSOF 76 cites to Zegger Deposition at pages 102-103. There, Zegger says nothing about communicating with Jennifer Barber-Uhri. Defendant also cites to its Exhibit 39 which is the email of April 10, 2020. Plaintiff received this document after discovery closed on June 20, 2022 (PSOF 118; also see Plaintiff's Exhibit 7- Gaffney Declaration, Exhibit A2, Defendant's Amended Initial Disclosures dated January 31, 2022 did not list Jennifer Barber-Uhri At this juncture, neither Party has any recorded testimony from Zegger, Kulovitz or Jennifer Barber-Uhri on their communications in April, 2020.

### Oral or written statements

Oral or written statements made by the individuals recommending or approving the challenged adverse action may reveal retaliatory intent by expressing retaliatory animus or by revealing inconsistencies, pre-determined decisions, or other indications that the reasons given for the adverse action are false. *See, e.g.*, *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 709-10 (7th Cir. 2011) (concluding that evidence of plant manager's statement to African-American employee that he was "playing the race card" was sufficient to deny employer's motion for summary judgment on claim of retaliatory termination for race discrimination complaints). *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 851 (7th Cir. 2007) (ruling that inconsistent explanations by employer presented issue for jury). Here, Plaintiff has more statements, many are more direct and egregious. Expressions of retaliatory animus, inconsistencies, pre-determined indications and falsehoods predominate the termination decision making process.

### Plaintiff has Significant Cat's Paw Evidence

Under such a theory, an employer may be liable for the retaliatory actions of a subordinate who lacked formal decision-making power if the subordinate's actions were the proximate cause of the adverse employment action. *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461–62 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 401, 211 L.Ed.2d 215 (2021). In other words, "[a]nimus and responsibility for the adverse action can both be attributed to the earlier agent ... if the adverse action is the intended consequence of that agent's discriminatory conduct." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011).To avoid summary judgment, Plaintiff has identified evidence that would permit a reasonable juror to conclude that Zegger and Kulovitz proximately caused Huff's termination by actions that were tainted by an

improper motive. *Huff v. Buttigieg*, 42 F.4th 638, 647 (7th Cir. 2022); *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461–62 (7th Cir. 2021), *cert. denied*, 211 L. Ed. 2d 215, 142 S. Ct. 401 (2021). Proximate cause exists if the investigation took the improper complaints into account or if the investigation "relies on facts provided by the biased supervisor." *Vesey v. Envoy Air, Inc.,* 999 F.3d 456, 462 (7th Cir. 2021), *cert. denied,* 211 L. Ed. 2d 215, 142 S. Ct. 401 (2021).

  From the record, we know that Kulovitz and Zegger held a dramatic discriminatory and retaliatory animus toward Plaintiff and expressed the same both to Plaintiff and to Brooks-Lipor in no uncertain terms. The entire investigation is tainted by false and derogatory statements directly related to Plaintiff's protected activities. A reasonable jury would easily infer that Brooks-Lipor could not and did not erase all that muck from the chalkboard of the decision-making process.*‡ The final stamp of the Kulovitz paw exists within Defendant's Exhibit 39 with termination approval being given only after "guidance by H.R." Defendant does not say what that guidance was so we must presume that the H.R. guidance would not be favorable for this case and there should be an adverse inference associated with the failure of Defendants to identify Jennifer Barber-Uri as a witness or what "guidance" she received from H.R. (See, eg Seventh Cir. Jury Instructions 1.19 and 1.20). Defendant also violated Rule 26 by not disclosing her which is another reason to deny summary judgment. Rule 26(e) requires a party to *timely* supplement its initial disclosures and discovery responses when it learns of new information or information that renders an earlier response inaccurate" or incomplete. Fed. R. Civ. P. 26(e)(1)(A); *Sys. Dev. Integration, LLC v. Comput. Scis. Corp.*, No. 09-CV-4008, 2012 WL 2953063, at *2 (N.D. Ill. July 19, 2012) (emphasis in original). Additionally, an unfavorable

---

‡ In the Brooks-Lipor deposition it became clear that she had a predetermined agenda to repeatedly say that all those questions she asked and all that information she received did not matter.

evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under its control. *Wachovia Sec., LLC v. Neuhauser,* 528 F. Supp. 2d 834, 855 (N.D. Ill. 2007).

### The Brooks-Lipor Comparatives Provide Valuable Circumstantial Evidence of a Double Standard and also satisfy the McDonnell Douglas requirement leading to Pretext

Under the burden shifting method, Plaintiff must first state a *prima facie* case by demonstrating, by a preponderance of the evidence, that: (1) she was meeting Defendant's legitimate expectations, (2) suffered an adverse employment action, and (3) was treated less favorably that similarly-situated employees who did not request FMLA leave. *Langenbach v. Wal–Mart Stores, Inc.*, 761 F.3d 792, 800 (7th Cir. 2014). *Walker v. JP Morgan Chase Bank, N.A.,* 262 F. Supp. 3d 574, 585 (N.D. Ill. 2017). Here, Plaintiff has submitted numerous employees investigated by Brooks-Lipor that were either given a pass because of credibility issues or conflicting statements or where there was findings of substantiated, provided coaching, oral warnings, written warnings and one final written warning. A jury can reasonably infer discrimination "when an employer treats an employee in a protected class less favorably than it treats a similarly-situated employee outside that class." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (citing *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). Whether a comparator is similarly situated is "usually a question for the fact-finder," and summary judgment is appropriate only when "no reasonable fact - finder could find that plaintiffs have met their burden on the issue." *Srail v. Village of Lisle,* 588 F.3d 940, 945 (7th Cir.2009). Defendant cannot point out differences if the employer never considered that characteristic." *Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551, 559 (7th Cir. 2011). Plaintiff's evidence, detailed above on the fifteen other investigations and recommendations made by

Brooks -Lipor establish a triable issue of fact on Defendant's good faith reasonable belief defense an under *Ortiz,* is added to the heavy pile of direct and circumstantial that requires denial of summary judgment.

## V. Plaintiff's Response to Defendant's Motion for Summary Judgment on the After Acquired Evidence Affirmative Defense and Cross Motion for Summary Judgment

The Cromwell declaration, even if admissible, does not support the elements of this affirmative defense. Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of discharge. *McKennon v. Nashville Banner Pub. Co.*, *513 U.S. 352, 362-63 (1995).* Not every resume misrepresentation limits backpay damages. *O'Neal v. City of New Albany*, 293 F.3d 998, 1004 (7th Cir. 2002); *see Lalowski v. Corinthian Sch., Inc.*, 2013 WL 1788353, at *9 (N.D. Ill. Apr. 26, 2013) ("Defendants here do nothing more than assert Lalowski would have been fired after they discovered he failed to include all his employers on his resume."). *Reed v. Amax Coal Co.*, 971 F.2d 1295, 1298 (7th Cir. 1992) (finding that employer's proof that it could have terminated employee for alleged misconduct was improper basis for granting summary judgment in favor of employer). *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760, 766–67 (7th Cir. 2016); *see also Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005). *See e.g., Turner v. Am. Bottling Co.*, 2019 WL 932017, at *8 (N.D. Ill. Feb. 26, 2019) (denying after-evidence doctrine argument at summary judgment "because there are genuine disputes in the record")

The Cromwell Declaration is problematic for multiple reasons. First, Cromwell's Declaration dated September 7, 2022 contradicts his deposition testimony. When asked about Plaintiff's application his response was "I may have seen it. I don't remember. It has been a long time."

(PSOF 98 ). A multitude of cases stands for the proposition that a party cannot use at summary judgment an affidavit that conflicts with earlier deposition testimony. *See e.g., AdelmanTremblay v. Jewel Companies, Inc.,* 859 F.2d 517, 520 (7th Cir.1988); *Diliberti v. United States,* 817 F.2d 1259, 1263 (7th Cir.1987).

As set forth within the Gaffney Declaration (Plaintiff's Exhibit 107), Gregory Cromwell was never identified as a witness in any of Defendant's disclosures. Rule 37(c) provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1).

The opinion in ¶6 claiming that he would not have hired Retamozo is not relevant to the after acquired evidence affirmative defense because that defense only applies to a limitation of backpay damages from the date the employer learned of the assertiveness conduct (as per the above case law). Equally problematic is Cromwell's assertion within ¶8 that he would have "sought to terminate her employment for providing false information". Cromwell fails to assert what, if any, authority he had to seek someone's termination. Cromwell's Declaration's fails to provide any facts or details regarding how that may have occurred and it certainly doesn't begin to assert that Cromwell had authority to terminate her. Therefore, for all of the reasons set forth above, Cromwell's Declaration should be stricken, disregarded or provided "zero weight". *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir.1994); *Buttron v. Wal-Mart Assocs.*, 301 F.3d 621, 623, 2003 WL 21801222, (7th Cir. 2002).

Respectfully submitted,

*/s/Glenn R. Gaffney*
Glenn R. Gaffney
Attorney for Plaintiff

Glenn R. Gaffney (6180598)
Gaffney & Gaffney P.C.
1771 Bloomingdale Road
Glendale Heights, IL 60139
(630) 462-1200
glenn@gaffneylawpc.com