UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Fouzia Retamozo,

    *Plaintiff,*

v.

U.S. Bancorp, *doing business as*, U.S.
Bank,

    *Defendant.*

No. 21 CV 1652

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

In a suit against her former employer U.S. Bancorp ("U.S. Bank"), Plaintiff Fouzia Retamozo ("Retamozo") alleges a failure to accommodate under the Americans with Disabilities Act ("ADA") (Count One); retaliation under the ADA (Count Two); disparate treatment under the ADA (Count Three);[1] and interference and retaliation under the Family Medical Leave Act ("FMLA") (Count Four). [Dkt. No. 12.]

Before the Court are two motions for summary judgment. [Dkt. Nos. 73, 83.] Summary judgment is granted on Retamozo's ADA failure to accommodate claim and on her FMLA interference claim, Counts One and Four respectively. Summary judgment is denied as to Retamozo's ADA retaliation claim, ADA disparate treatment claim, and FMLA retaliation claim, Counts Two, Three, and Four, respectively. The Court also denies U.S. Bank's motion for summary judgment on after-acquired evidence and grants Retamozo's cross-motion on that defense.

---

[1]    Retamozo voluntarily dismissed her ADA hostile work environment claim in Count Three. [Dkt. No. 69.]

I. **Factual Background**[2]

   A. **Retamozo's FMLA Leave and ADA Accommodation**

Retamozo is a former employee of U.S. Bank. [Dkt. No. 80 at ¶¶ 3–4.] She worked as a Branch Manager at the Glenview branch from September 11, 2017 until her termination on April 11, 2020. [Id. ¶¶ 13, 15, 72.] From her start date until early 2019, Retamozo reported directly to Gregory Cromwell, U.S. Bank Vice President and District Manager. [Id. ¶¶ 12, 15.] Beginning in February of 2019, Retamozo reported to Deborah Zegger, another District Manager. [Id. ¶ 15.]

At the start of her employment, Retamozo gave notice to U.S. Bank that she and her daughter were a victim of domestic violence and qualified for leave under the Illinois Victims Economic Security and Safety Act ("VESSA").[3] [Dkt. No. 86 at ¶ 1.] At various times between 2017 to 2019, Retamozo emailed her superiors and HR personnel requesting leave under VESSA. [Id. ¶¶ 2–6, 11 (requesting "leniency" or "guidance" in additional to VESSA leave).] In large part, U.S. Bank granted these requests. [Dkt. No. 74-15.]

Retamozo first became eligible for FMLA leave on September 11, 2018, and she subsequently requested and received a twelve-week FMLA leave of absence from

---

[2] The following facts are undisputed, unless otherwise noted. In the context of cross-motions for summary judgment, the Court views the facts in the light most favorable to party against whom the motion under consideration is made. *See Med. Protective Co. of Fort Wayne, Ind. v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018).

[3] Retamozo does not bring a state law VESSA claim in this case. [Dkt. No. 12.] As Defendant points out, that claim is currently pending before the Illinois Department of Labor. [Dkt. No. 87 at 4 n.2.] The Court considers facts related to VESSA only to the extent they relate to the ADA failure to accommodate claim.

October 1, 2018 to December 26, 2018. [Dkt. No. 80 at ¶¶ 19–20.] On returning from leave on December 27, 2018, she resumed her position as Branch Manager. [*Id.* ¶ 21.]

After a workplace incident on April 18, 2019, Retamozo requested and took a worker's compensation leave of absence from April 19 through June 3, 2019. [Dkt. No. 80 at ¶ 22; Dkt. No. 86 at ¶ 14.] Following that leave, Zegger emailed Retamozo to notify her that she had "exhausted FMLA and Illinois state leave, including VESSA" and thus was not eligible for "FMLA or similar state leave" at that time. [Dkt. No. 80 at ¶ 23.] Even so, Zegger stated that Defendant would "work with" Retamozo and would "approve time off" for Retamozo to attend to her and her daughter's needs. [*Id.*] Zegger further noted that if Retamozo needed any at-work modifications, she should contact Zegger or another Human Resources employee, Joan Kulovitz, who was assigned to the Glenview branch. [*Id.* ¶¶ 23, 26.] That same day, Retamozo responded and requested an ADA accommodation to attend "counseling services weekly" for herself and her daughter. [*Id.* ¶ 24.] Zegger told Retamozo that Kulovitz would follow up about this request. [*Id.* ¶ 26.]

On July 18, 2019, Kulovitz emailed a questionnaire to Retamozo that sought information from Retamozo's medical provider related to her ADA accommodation request. [Dkt. No. 80 at ¶ 27.] On July 29, 2019, Retamozo's medical provider, Dr. Yael Ron, submitted the completed questionnaire. [*Id.* ¶ 28.] Dr. Ron noted that Retamozo could carry out her job requirements with certain accommodations, "such as business calling & extended deadlines for completing tasks." [*Id.* ¶ 29.] Dr. Ron also noted that Retamozo needed to be absent from work on an intermittent basis to

3

"attend 1-2 hours of psychotherapy weekly" and that "her daughter's treatment might require similar amount to [sic] time devoted to meetings weekly." [*Id.*] In response to the questionnaire's inquiry as to whether there were "any modifications that would assist [Retamozo] in performing her job," Dr. Ron stated that Retamozo should be allowed to (1) "[t]ake conference calls on her mobile when heading to or out of office, (2) "attend meeting and appointments without harassing and shaming her," and (3) be "paid [and] unpaid time off in case of emergency & immediate threat to her or her daughter's safety." [*Id.* ¶ 30.]

On August 7, 2019, Kulovitz confirmed by email that the Bank had received Dr. Ron's completed questionnaire. [*Id.* ¶ 31.] Kulovitz informed Retamozo that U.S. Bank would accommodate her "request for one to two hours per week away from work to attend to [her] own psychotherapy appointment." [*Id.*] As before, Kulovitz informed Retamozo that although she was not eligible for FMLA or similar state leave, the Bank would work with her to the extent that it could approve time off for Retamozo to attend to her and her daughter's needs. [*Id.*] That same day, Retamozo replied, asking if U.S. Bank would honor accommodations "other than just medical appointments." [*Id.* ¶ 32.] On August 9, 2019, Retamozo and Kulovitz spoke by phone to discuss the requested accommodations. [*Id.* ¶ 33.]

On August 15, 2019, Retamozo emailed Kulovitz to "follow up on all the accommodations and request approval for each listed item" in the questionnaire. [*Id.* ¶ 34.] Retamozo's email stated that she has "forgetfulness/confusion at times" when she was "dealing with relapses." [*Id.*] Retamozo stated that she wanted Zegger "to be

4

aware of that," and that she could "make errors at times when dealing with operational expectations to be met." [*Id.*] As an example, Retamozo said that on August 5, 2019, she audited the branch's ATM instead of the vault as instructed, and as such would need an "adjustment" from Zegger. [*Id.*]

On August 21, 2019, Kulovitz emailed Retamozo to summarize their telephone conversation from August 9th and to answer Retamozo's lingering questions about her accommodations. [*Id.* ¶ 35.] Kulovitz reiterated that U.S. Bank would accommodate for Retamozo's psychotherapy appointments and noted that as of July 16th—the date of her initial accommodation request—Retamozo was allowed to use her cell phone for the weekly managers' call and to forgo small business calls. [*Id.* ¶¶ 35–36, 40–42.] Kulovitz noted that U.S. Bank would accommodate Retamozo's requests for leave as needed, even though she had no remaining FMLA leave. [*Id.* ¶ 35.] Finally, in response to Retamozo's request to make operational errors, Kulovitz explained that Retamozo would "continue to be held to the performance expectations of [her] position," which included "attending applicable meetings, and following normal reporting, operational, and other policies and procedures." [*Id.* ¶ 36.]

On September 5, 2019, Retamozo emailed Kulovitz requesting an in-person meeting to discuss her requested accommodations, specifically noting that she wanted to share the "handbook from the State of IL Dept. of Labor" so Kulovitz could "see why [her] doctor requested detailed information specific to [her] job performance and needs outside the workplace." [*Id.*] Kulovitz and Retamozo subsequently met on September 17, 2019, and spoke about the accommodations she should receive as a

5

parent of a qualifying individual under VESSA. [*Id.* ¶¶ 37–38.] According to Retamozo, Kulovitz told her that her accommodation was "unnecessary" as the Bank had already done "enough," a statement U.S. Bank denies. [Dkt. No. 86 at ¶ 31.] On September 20, 2019, Kulovitz emailed Retamozo, reiterating that U.S. Bank would accommodate her psychotherapy appointments and approve her time off requests as needed, despite not qualifying for FMLA leave at that time. [Dkt. No. 80 at ¶ 39.]

Retamozo requested and took a second twelve-week FMLA leave from October 1, 2019 to December 26, 2019. [*Id.* ¶ 44.] On returning from that leave, she resumed her position as Branch Manager of the Glenview branch. [*Id.* ¶ 45.]

## B. The Misconduct Investigation

After her return from the second FMLA leave, three events prompted U.S. Bank to investigate Retamozo for misconduct in violation of U.S. Bank's Code of Ethics. During the first incident on January 21, 2020, Retamozo showed Michael Barnes, an employee who directly reported to Retamozo, photos of herself and her fiancé. [Dkt. No. 80 at ¶¶ 46–48.] Retamozo admits that the photos she showed Barnes depicted her exposed belly and her fiancé's bare chest. [Dkt. No. 86 at ¶ 25.] U.S. Bank maintains that the images were nude photos of Retamozo and her fiancé in sexual poses, including depicting Retamozo's breasts. [Dkt. No. 80 at ¶¶ 47–48.]

The second incident occurred on February 14, 2020. Retamozo's fiancé came to the Glenview branch, took off his clothing from the waist up, and danced in Retamozo's office with her office door open. [*Id.* ¶¶ 47, 49.] The parties agree that Retamozo did not know about this event beforehand. [Dkt. No. 86 at ¶ 26.] Later that

6

same day, Retamozo and her fiancé were inside Retamozo's office with the door closed for approximately one hour. [Dkt. No. 80 at ¶¶ 47, 50–52.]

For the third incident on February 18, 2020, Retamozo sent Barnes a text message that read, "[g]oing to get vagina rejuvenated again soon." [*Id.* ¶ 53.] Retamozo admits that she sent the text message to Barnes but did so by mistake. [Dkt. No. 86 at ¶¶ 29, 34.] She did not report to this incident to Zegger or anyone else at U.S. Bank. [Dkt. No. 80 at ¶ 53.]

On February 21, 2020, Zegger and Kulovitz received information about each of these incidents, along with additional information that Retamozo may have sent an inappropriate photo to another co-another worker via SnapChat. [*Id.* ¶ 47.] Kulovitz submitted a summary of these complaints to U.S. Bank's Centralized Investigations Team ("CIT"). [*Id.* ¶ 55.] Emily Brooks-Lipor, a Senior CIT Investigator, was assigned to investigate. [*Id.* ¶ 56.] Brooks-Lipor did not know Retamozo, Zegger or Kulovitz prior to her investigation. [*Id.* ¶¶ 57–60.] Brooks-Lipor testified that she had previously investigated other U.S. Bank employees for sexual harassment and misconduct. [Dkt. No. 86 at ¶¶ 80–94.]

To investigate, Brooks-Lipor reviewed relevant text messages and security video photographs from January 21 to February 14, 2020. [Dkt. No. 80 at ¶ 68.] She also interviewed several employees who worked with Retamozo during the relevant times and took notes of those interviews. [Dkt. No. 80 at ¶ 62; Dkt. No. 74-19.] The witnesses Brooks-Lipor interviewed generally confirmed the details of the incident from February 14. [Dkt. No. 80 at ¶¶ 66–67.] Barnes also confirmed that Retamozo

showed him nude photos of herself and her fiancé and sent the text message described above. [*Id.* ¶¶ 63–64.]

During several interviews, Brooks-Lipor learned of Retamozo's leaves of absence. [*Id.* ¶ 72.] During his interview, Barnes relayed that Retamozo was gone for a six-month period and "was out of the bank a lot and not in regular attendance." [Dkt. No. 86 at ¶ 65.] During her interview, Zegger similarly noted that Retamozo "was on leave of absence for six months," seemed to "come[] and go[] whenever," only worked four hours a day on many occasions, and started work at 10:30 or 11:00 a.m. [*Id.* ¶ 70; Dkt. No. 74-19 at 50.] Zegger further noted a "pattern" that as soon as Retamozo was eligible for leave, she would take it. [Dkt. No. 86 at ¶ 71.] Zegger described previous attempts to hold Retamozo accountable but commented that she "hides under . . . doctor's notes," using them as a "get out of jail free card" and says she is under "too much stress." [*Id.* at ¶ 70.]

Brooks-Lipor learned similar information about Retamozo's medical condition during a conversation with Kulovitz on March 26, 2020. [*Id.* ¶ 77.] Kulovitz said that Retamozo had "stuff behind the curtain" that she was "protected by," and that the "things behind her 'medical curtain'" were very new, which resulted in "her being out of the office more." [Dkt. No. 74-19 at 74.] Kulovitz said "every time [Retamozo] has to leave we have to take it at face value but does it always seem truthful . . . no." [*Id.*; Dkt. No. 86 at ¶¶ 52, 77.] According to Brooks-Lipor's notes, Kulovitz said that there were "other things going on with [Retamozo] regarding performance stuff." [Dkt. No. 86 at ¶ 52.] When Kulovitz was deposed, she acknowledged that during the early part

8

of 2020, there were no performance concerns regarding Retamozo, and that she was not involved in Retamozo's "performance management." [Dkt. No. 81-3 at 41 ("Q.: Was there any indication to you as of February 25, 2020, that there were any performance concerns? A. Not to my knowledge on performance concerns.").]

During her deposition, Brooks-Lipor testified that she had no knowledge of Retamozo's disability, nor was she familiar with any of Retamozo's requests for accommodations. [Dkt. No. 81-4 at 285–86.] Brooks-Lipor also acknowledged that during her investigation, she became aware of other concerns outside of the sexual harassment allegations, which Brooks-Lipor characterized as "concerns generally" regarding Retamozo's employment and the ADA and FMLA. [*Id.* at 34–37.] Brooks-Lipor testified that these details did not factor into conclusions and that her focus was on the information relevant to her investigation. [*Id.* at 130, 136.]

Brooks-Lipor closed her investigation on April 6, 2020, and memorialized her findings and recommendations in a report entitled, "Investigation Resolution Form." [Dkt. No. 80 at ¶ 69.] The final report substantiated the complaints regarding the text message and sexual photos Retamozo sent to Barnes, as well as the events of February 14. [*Id.* ¶ 70.] Unlike her interview notes, which contained detailed summaries of Zegger and Kulovitz's remarks about Retamozo's absences, the final report did not include these comments. [Dkt. No. 74-19 at 78.] The report contained the following "additional note:" "There appear to be several other concerns regarding Retamozo's performance and leadership abilities that may need to be addressed." [Dkt. No. 74-19 at 78; Dkt. No. 86 at ¶ 78.]

9

Brooks-Lipor recommended Retamozo's termination, stating that Retamozo had violated U.S. Bank's Code of Ethics and Business Conduct, and Workplace Respect Policies. [Dkt. No. 80 at ¶ 70.] Brooks-Lipor testified that she made her recommendation based on the complaints about Retamozo's behavior, not her disability or leaves of absence. [*Id.* ¶¶ 71–73.] Retamozo disputes this. [*Id.*] occasion

Brooks-Lipor communicated her investigation's results first to Tina Vincelli, a U.S. Bank employee who was not the final decisionmaker. [*Id.* ¶ 74.] Vincelli responded that she was "happy to chat but given what has been substantiated," particularly the allegations concerning Retamozo sharing partially nude photos of herself and the incident from February 14th, she did not "think there is any way we don't term[inate] here." [*Id.* ¶ 75.] On April 10, 2020, Zegger sent an email about the investigation's results to Jennifer Barber-Uhri, U.S. Bank Senior Vice President. [Dkt. No. 80 at ¶ 76; Dkt. No. 74-40 at 2.] Zegger relayed that CIT's investigation into Retamozo was complete and that the investigation "substantiated the allegations of [Retamozo] showing her employee inappropriate pictures of herself and her fiancé in which were of nudity and sexual content" and of Retamozo's "fiancé behaving [sic] inappropriate during work hours at the branch." [*Id.*] Zegger noted the recommendation to terminate Retamozo and requested approval to do so. [*Id.*] Barber-Uhri responded that while the investigation's contents needed to remain confidential, she approved Retamozo's termination "based on the conclusions of the investigation and guidance given by H.R." [*Id.*] Retamozo was terminated on April 11, 2020. [*Id.* ¶ 77.]

## II.     Legal Standard

The Court should grant summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). As the Court confronts cross-motions for summary judgment, the Court views the facts in the light most favorable to party against whom the motion under consideration is made. *See Med. Protective Co. of Fort Wayne v., Ind. v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). The Court may not weigh conflicting evidence or make credibility determinations. *See Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Further, the Court must give the nonmovant "the benefit of reasonable inferences from the evidence, but not speculative inferences in [her] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## III.    Analysis

### A.     Count One: Failure to Accommodate under the ADA

U.S. Bank moves for summary judgment on Retamozo's ADA failure to accommodate claim. [Dkt. No. 75 at 7–9; Dkt. No. 87 at 2–9.] The ADA prohibits

11

employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To comply with this provision, employers must "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" unless doing so "would impose an undue hardship on the operation of [employer's] business." *Id.* § 12112(b)(5)(A); *see also Brown v. Milwaukee Bd. of Sch. Dir.*, 855 F.3d 818, 820 (7th Cir. 2017).

A *prima facie* failure-to-accommodate claim consists of three elements. The plaintiff must prove (1) that she "is a qualified individual with a disability;" (2) that the defendant "was aware of her disability," and (3) that the defendant "failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). The parties do not dispute that Retamozo was disabled or that U.S. Bank was aware of her disability. [Dkt. Nos. 75, 83, 87, 90.] The Court's analysis focuses on whether U.S. Bank failed to reasonably accommodate her.

Identifying reasonable accommodations for a disabled employee requires the employer and employee "to engage in a flexible, interactive process." *Brown*, 855 F.3d at 824. An employer satisfies its duty to reasonably accommodate a disabled employee when the employer does what is necessary to allow the employee to work in reasonable comfort. *Hoppe v. Lewis Univ.*, 692 F. 3d 833, 840 (7th Cir. 2012). An employer need only provide a qualified individual with a "reasonable accommodation,

not the accommodation [the employee] would prefer." *Rehling v. City of Chi.*, 207 F.3d 1009, 1014 (7th Cir. 2000).

U.S. Bank argues that it is entitled to summary judgment because it granted the necessary accommodations Retamozo requested. [Dkt. No. 75 at 7.] The Court agrees. Between July and August of 2019, Retamozo requested four accommodations: (1) that she be allowed to attend her psychotherapy appointments for one to hours per week,[4] (2) that she be allowed to take the manager's morning calls from her cell phone, (3) that she be excused from small business calls, and (4) that she be allowed to make operational errors. [Dkt. No. 80 at ¶¶ 24–36.] U.S. Bank granted the first three requests, satisfying its duty to provide a reasonable accommodation.[5] *Hoppe*, 692 F. 3d at 840. [*Id.* ¶¶ 31, 33, 35.]

The leaves the fourth request that Retamozo be allowed to make operational errors. Under the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An "essential

---

[4]     Retamozo denies that she was allowed to attend all her psychotherapy appointments but marshals no relevant facts to that effect. [Dkt. No. 80 at ¶ 25.] The evidence to which she cites refers to a September 20, 2019 email, where she was granted leave to attend a doctor's appointment, and other written communications requesting accommodations between September 2017 to May 2019. [*Id.*] As discussed later in this opinion, these earlier requests constitute an improper attempt to amend the Complaint.

[5]     Retamozo concedes that portions of Dr. Ron's questionnaire request accommodations for Retamozo's daughter's clinical appointments. [Dkt. No. 75 at 8 n.3; Dkt. No. 80 at ¶¶ 37–38.] Those requests do not apply to claims under the ADA. The ADA does not require an employer to modify its leave policy for an employee who needs to take time off for a child. *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) ("A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'").

function" is a task so important to a disabled employee's position that the employee's inability to perform it with the aid of reasonable accommodation disqualifies that employee from holding that position. *See* 29 C.F.R. § 1630.2(n)(1) ("The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires."). Put simply, although the ADA requires that employers adapt the workplace to the disabled employees' needs, all employees— disabled or otherwise—may be required to perform certain tasks and a disabled employee may not demand that the employer dispense with that requirement as an accommodation. *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)) (noting that an accommodation is *per se* unreasonable when the accommodation itself creates "an inability to do the job's essential tasks").

Retamozo concedes that an "essential" job duty as a branch manager was to "ensure[] documentation and/or reporting of all applicable transactions is within accepted quality standards of completeness and accuracy." [Dkt. No. 80 at ¶ 16.] This means that her request to be allowed to make operational errors would necessarily require that she not meet "accepted quality standards of completeness and accuracy" or, put more simply, not complete an essential task. [*Id.*] U.S. Bank was not required to grant this accommodation because doing so would render her unable to perform an essential task. *Severson*, 872 at 481.

Retamozo does not seriously argue that U.S. Bank's denial of this request constitutes a failure to accommodate. Rather, she argues for the first time that U.S.

Case: 1:21-cv-01652 Document #: 103 Filed: 08/18/23 Page 15 of 31 PageID #:3671

Bank violated the ADA by failing to accommodate requests she made *before* July of 2019. [Dkt. No. 83 at 14–16.] Her brief cites to a laundry list of requests from 2018 through early 2019 that Retamozo characterizes as "multiple requests, representations and statements [that] put Defendant on notice that she was requesting an accommodation based upon her medical condition." [Dkt. No. 83 at 15 (citing Dkt. No. 80 at ¶¶ 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, 15 and 119).]

But these new assertions are an improper attempt to amend the FAC at the summary judgment stage.[6] A plaintiff may not change her factual theory during summary judgment briefing; any attempt to alter the factual basis of a claim at summary judgment may amount to a *de facto* attempt to amend the complaint. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). When a new argument is made at the summary judgment stage, "the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories plaintiff has pursued so far." *Id.* (citing *Whitaker v. Milwaukee Cnty., Wis.*, 772 F.3d 802, 808–09 (7th Cir. 2014)). This is distinct from a change in a legal theory asserted in a complaint, which can be changed absent undue cost, difficulty, or unreasonable delay. *See Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996) ("[T]here is no burden on the plaintiff to justify altering [her] original [legal] theory."); *see also Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 909 (7th Cir. 2012) (en banc)

---

[6] U.S. Bank additionally argues that Retamozo's new claims are untimely and unexhausted. [Dkt. No. 87 at 4–6.] Because the Court finds that Retamozo's failure to accommodate claim fails for other independent reasons, the Court does not address these arguments.

(holding that plaintiffs are not required to plead legal theories after *Twombly* and *Iqbal*).

Here, the FAC alleges that Retamozo made her first request for an ADA accommodation on June 3, 2019, when she returned from a worker's compensation leave. [Dkt. No. 12 at ¶ 22; Dkt. No. 80 at ¶ 22; Dkt. No. 86 at ¶ 14.] The new allegations, made for the first time at summary judgment, cannot be said to be "an alternative legal characterization" of existing facts. They are entirely new facts not made at the pleadings stage. *Chessie*, 867 F.3d at 861. The Court rejects this *de facto* attempt to amend. *Id.*; *Whitaker*, 772 F.3d at 808.

Even if Retamozo's new allegations had been included in her pleadings, they cannot survive for other reasons. Many of the accommodation requests she cites to were made pursuant to VESSA or the FMLA, and not the ADA.[7] [Dkt. No. 80 at ¶¶ 2, 3, 5, 6, 7, 10, 11.] For example, Retamozo cites to two emails from September 26, 2018 and November 8, 2018, but those emails concerned FMLA leave she requested and received from October 1, 2018 to December 26, 2018. [*Id.* at ¶¶ 19-20; Dkt. No. 82-1 at 6–7.] Still other requests, such as a January 8, 2018 email to HR, requested "a little leniency in regards to my accommodations while healing." [Dkt. No. 80 at ¶ 2.] These requests are vague and lack sufficient information from which to determine the nature of the requested accommodation. *See Brown*, 855 F.3d at 821 (quoting

---

[7] Retamozo tacitly acknowledges that she repeatedly blurs the lines between her ADA, VESSA, and FMLA claims. [Dkt. No. 83 at 15.] And though a VESSA request for an accommodation on Retamozo's own behalf *might* amount to an ADA violation, a request for accommodation for her daughter would not. *See Brown v. Milwaukee Bd. of Sch. Dir.*, 855 F.3d 818, 820–21 (7th Cir. 2017) (noting that employers must make reasonable accommodations for disabled employees and applicants).

16

*Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 702 (7th Cir. 2014))
(holding that if the employee "does not provide sufficient information to the employer
to determine the necessary accommodations, the employer cannot be held liable for
failing to accommodate the disabled employee").

Still other citations are unsupported by the record. [Dkt. No. 80 at ¶¶ 9, 12.]
Aside from the lack of specificity, Retamozo's vague references to instances when she
claims to have missed doctor's appointments or was forced to use vacation or sick
leave are simply belied by the record. At her deposition, Retamozo repeatedly testified
that she was allowed to take time for doctor's appointments before July of 2019. [Dkt.
No. 80 at ¶¶ 41–42.]

At bottom, even if the new allegations from 2018 and early 2019 could be
considered, Retamozo has failed to marshal supporting evidence in support of her
ADA failure to accommodate claim. *See Michael v. St. Joseph Cnty.*, 259 F.3d 842,
845 (7th Cir. 2001) (noting that "[b]ecause the purpose of summary judgment is to
isolate and dispose of factually unsupported claims," a plaintiff must respond with
"specific facts showing that there is a genuine issue for trial"); *see also United States
v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped
arguments, and arguments that are unsupported by pertinent authority, are
waived"). The Court grants summary judgment in favor of U.S. Bank's motion as to
Count One.

### B.    Counts Two and Four: ADA and FMLA Retaliation

U.S. Bank also moves for summary judgment on Retamozo's claims of ADA and

17

FMLA retaliation, Counts Two and Four. [Dkt. No. 75 at 9.] Because FMLA and ADA claims are analyzed under the same legal standard and the claims presented arise from the same set of facts, the Court considers these claims together. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (noting that the Court "evaluate[s] a claim of FMLA retaliation the same way that [it] would evaluate a claim of retaliation under other employment statutes, such as the ADA"); *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901–02 (7th Cir. 2018) (considering ADA and FMLA retaliation claims together).

An employer may not retaliate against an employee who asserts her rights under the ADA or the FMLA. *See* 42 U.S.C. § 12203(a) (ADA); 29 U.S.C. § 2615(a)(2) (FMLA). To prove ADA or FMLA retaliation, Retamozo must show that (1) she engaged in a statutorily protected activity, (2) she suffered a materially adverse action, and (3) that protected activity caused the adverse action. *Freelain*, 888 F.3d at 901. In deciding whether there is a genuine issue of material fact that precludes summary judgment, the Court must "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936–37 (7th Cir. 2022) (quoting *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017)). Circumstantial evidence of causation includes: "(1) suspicious timing, (2) ambiguous statements or behavior towards other employees in the protected group, (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically received better treatment, and (4) evidence that the employer offered a pretextual reason for an adverse

18

employment action." *Id.* at 937 (quoting *Rowlands v. United Parcel Serv.–Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018)). The parties agree Retamozo engaged in statutorily protected activity by requesting FMLA leave and ADA accommodations, and that she later suffered a materially adverse action in the form of her termination. [Dkt. No. 75 at 7, 9–12; Dkt. No. 83 at 17.]

That leaves the question of causation. Retamozo advances a cat's paw theory of liability to overcome summary judgment. [Dkt. No. 83 at 21–23.] Cat's paw liability applies when a biased supervisor "who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013) (internal quotation marks omitted) (quoting *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012)). To show discrimination under this theory of liability, Retamozo must present evidence that the biased non-supervisor—here, Zegger and Kulovitz—"actually harbored discriminatory animus against her and that the employee's scheme proximately caused her termination." *Brooks v. Avancez*, 39 F.4th 424, 439 (7th Cir. 2022). Proximate cause under a cat's paw liability theory exists only if the investigation took a complaint "into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified" or if the investigation "relies on facts provided by the biased supervisor." *Staub v. Proctor Hospital, Inc.*, 562 U.S. 411, 421 (2011). The cat's paw theory of liability does not apply where the decisionmaker does not rely on the conclusions of an allegedly biased employee, but instead decides bases her decision on facts presented by an unbiased

19

party. *Woods v. City of Berwyn*, 803 F.3d 865, 870–71 (7th Cir. 2015).

Viewing the record in the light most favorable to Retamozo, a reasonable factfinder could conclude that Zegger and Kulovitz were motivated at least in part by retaliatory animus arising from Retamozo's disability and leaves of absence, and that this proximately caused the termination. First, Retamozo has presented sufficient evidence of retaliatory animus by Zegger and Kulovitz as "biased" employees. *Brooks*, 39 F.4th at 439. At least according to Brook-Lipor's notes, Zegger expressed that Retamozo was often absent from the branch, seemingly to attend doctor's appointments, and would take "leave" as soon as she was eligible for it. [Dkt. No. 86 at ¶ 70.] Zegger stated that Retamozo would "hide" from accountability by using her doctor's notes—her "get out of jail free card"—to escape work-related consequences for her leave. [*Id.*] Similar animus was documented in notes from the conversation with Kulovitz, who said that Retamozo "comes with some stuff behind the curtain," and "things behind her 'medical curtain.'" [Dkt. No. 82-5 at 57.] She further expressed skepticism about the veracity of Retamozo's requests for leave or accommodation, noting that they did not all "seem truthful." [Dkt. No. 86 at ¶ 77.] If these statements are believed, both expressed frustration that Retamozo was taking extended leave or leaving the office for medical appointment and were skeptical that Retamozo was being truthful about these requests. [Dkt. No. 86 at ¶¶ 70, 72, 77.] From this evidence, a reasonable jury could conclude that both harbored retaliatory animus for requesting accommodations under the ADA or leave under the FMLA.

But this alone is not enough, since "biased comments do not establish

discriminatory motive unless they were by the decision maker and can be connected to the decision." *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) Retamozo argues that she has also presented sufficient evidence to create a genuine issue of fact that Zegger and Kulovitz proximately caused the termination by way of influencing Brooks-Lipor's recommendation, which formed the basis of Barber-Uhri's decision to approve the termination.

U.S. Bank points to Brooks-Lipor's lack of awareness of Retamozo's disability or requests for accommodation and leave as proof that she only considered the sexual harassment allegations in formulating her decision to recommend termination. [Dkt. No. 75 at 11.] True, but granting summary judgment on this basis fails to view the record in the light most favorable to Retamozo, as the Court is required to do. *See Majors v. General Elec.*, 714 F.3d 527, 532 (7th Cir. 2013). U.S. Bank concedes that, through her interviews, Brooks-Lipor learned of information about Retamozo absences from the branch for doctor's appointments or other non-work-related reasons during at least three interviews, and she documented that information in her interview notes. [Dkt. No. 86 at ¶ 72.] Brooks-Lipor's final report did not directly reference the remarks from Barnes, Zegger and Kulovitz, but a reasonable jury might conclude that the information at least influenced her termination recommendation considering that the final report "referenced" a "performance concern." [Dkt. No. 83 at 20; Dkt. No. 74-19 at 78 ("[T]here appear to be several other concerns regarding Retamozo's performance and leadership abilities that may need to be addressed.").]

There is more. The final decision maker was Barber-Uhri, who received an

email from Zegger in April 2020 summarizing the investigation's results. [Dkt No. 74-40 at 2.] Zegger noted the recommendation to terminate Retamozo's employment, and she "request[ed] approval with moving forward with this course of action." [*Id.*] Barber-Uhri approved Retamozo's termination, stating that she was doing so "based on the conclusions of the investigation and guidance given by H.R." [*Id.*]

There is no evidence in the record about what Barber-Uhri meant by "guidance given by HR," likely because she was not deposed.[8] This statement, along with Barber-Uhri's note, is certainly open to interpretation. A reasonable jury might conclude it was a reference to HR employee Kulovitz, who expressed frustration about Retamozo's absences and motives behind those absences to Brooks-Lipor, but who later acknowledged she was unaware of any performance concerns about Retamozo. [Dkt. No. 81-3 at 41.] From this, a jury might conclude that both Brooks-Lipor and Barber-Uhri considered Retamozo's disability and leaves of absence—and therefore a biased input—in rendering the decision to terminate. *Staub*, 562 U.S. at 421; *Johnson*, 726 F.3d at 914. Conversely, a jury could reasonably deem the remarks inconsequential: that Brooks-Lipor excised the problematic comments when reaching her conclusions, and that Barber-Uhri was not influenced by others' views. But on this record, the Court cannot conclude as a matter of law that no reasonable jury

---

[8] The Court rejects Retamozo's invitation to apply an adverse inference against U.S. Bank as it relates to any facts surrounding Barber-Uhri's approval of Retamozo's termination for failing to disclose her as a witness during discovery. [Dkt. No. 80 at ¶ 74; Dkt. No. 83 at 22.] Retamozo issued document requests concerning Barber-Uhri on April 27, 2022. [Dkt. No. 54-1 at 7–8.] Fact discovery closed a month later. [Dkt. No. 45.] Yet, Retamozo failed to notice Barber-Uhri's deposition. The Court previously signaled that it was amenable to extending the close of fact discovery, but Retamozo did not seek an extension.

could find evidence of retaliatory animus.

Retamozo points to at least one other piece of circumstantial evidence of causation—that similarly situated employees outside of the protected group investigated by Brooks-Lipor for misconduct received better treatment. [Dkt. No. 83 at 10—13.] Retamozo's analysis asks the Court to consider "fourteen other investigations" where Brooks-Lipor made findings with less serious outcomes, even though some of those employees had appreciably different job duties, standards, and supervisors than Retamozo.

The Court declines to extend its analysis quite that far, and instead considers instances where other branch managers or assistant branch managers arguably engaged in behavior of "comparable seriousness" as Retamozo's conduct but were treated less harshly. *See Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) (noting that a proper comparator need not be the plaintiff's "doppelganger," merely "similar enough to eliminate confounding variables" (internal quotation marks omitted)); *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)) (holding that courts engaging in a comparator analysis must consider whether the two individuals "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them").

When an assistant branch manager named Heather Bedford sent an inappropriate sexual text message to a coworker, Brooks-Lipor recommended a verbal warning. [Dkt. No. 86 at ¶ 82.] When two other branch managers, Mark Jump

and Monte Davis, made lewd or sexual comments, Brooks-Lipor recommended written warnings or additional training. [*Id.* ¶¶ 87, 93.] When branch manager Brittany Brunker was investigated for exposing herself in a bank vault, Brooks-Lipor found the claim to be unsubstantiated because she deemed it accidental. [*Id.* ¶ 80.] Conversely, Retamozo received harsher discipline in the form of a termination, and the difference is at least noteworthy enough for a jury to consider as circumstantial evidence of causation.

For these reasons, the Court denies summary judgment on Counts Two and Four for retaliation under the ADA and the FMLA respectively.

### C.    Count Three: Disparate Treatment under the ADA

U.S. Bank moves for summary judgment on Retamozo's claims of disparate treatment under the ADA, Count Three. [Dkt. No. 75 at 9.] The ADA, as amended, provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . ." 42 U.S.C. § 12112(a). To make out an ADA disparate treatment claim, Retamozo must show that: (1) she is disabled, (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) the adverse job action was caused by her disability. *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016). The Court's ultimate inquiry in considering these steps is determining whether a reasonable factfinder could conclude that Retamozo's disability caused her termination. *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 504–05 (7th Cir. 2017)

24

(applying *Ortiz* to ADA disparate treatment claim). Cat's paw liability is available in the discrimination context. *See Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012).

Much like Retamozo's retaliation claims, the parties do not dispute that Retamozo was disabled and otherwise qualified to perform the essential functions of her job with or without reasonable accommodation and focus on the causation element. [Dkt. No. 75 at 13.] For the reasons already discussed, a reasonable jury could find that Retamozo was terminated because of her disability. There is some evidence that Zegger and Kulovitz made statements that evince discriminatory animus about Retamozo's doctor's appointments: "things behind her 'medical curtain'" that resulted in absences, and repeated requests for leave. At least according to Brooks-Lipor's notes, both women communicated these views during the investigation. Brooks-Lipor's report references "performance" concerns; Barber-Uhri's email references unspecified "guidance from HR."

At bottom, a jury might find that Retamozo's misconduct in early 2020 was the cause of her termination. But it might credit Retamozo's evidence that her disability caused her termination. Because a genuine issue of material fact remains, the ADA disparate treatment claim survives summary judgment.

### D.     Count Four: Unlawful Interference under the FMLA

U.S. Bank moves for summary judgment on Retamozo's FMLA interference claim. [Dkt. No. 75 at 13–15; Dkt. No. 87 at 2.] The FMLA allows eligible employees to take up to twelve weeks of leave during any twelve-month period if the employee

is unable to perform the functions of her position on account of a serious health condition. 29 U.S.C. § 2612(a)(1); *see also Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 635 (7th Cir. 2009). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided," including the provision of leave. 29 U.S.C. § 2615(a)(1). An employee claiming FMLA interference must show that: (1) she was eligible for FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of intent to take leave; and (5) her employer "interfered with, restrained, or denied FMLA benefits to which [s]he was entitled." *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022).

Retamozo's opposition brief does not address why her FMLA interference claim should not be dismissed. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016) (noting that failure to respond to arguments in summary judgment motion results in waiver). Even absent this waiver, Retamozo was granted all the FMLA leave for which she was eligible as of her eligibility date on September 11, 2018. *See* 29 U.S.C. § 2611(2)(A)(i) (defining an "eligible employee" as an employee who "has been employed for at least 12 months by the employer with respect to whom leave is requested"). Before then, Retamozo was not eligible for the benefit. *See Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013) (quoting *Walker v. Elmore County Board of Educ.*, 379 F.3d 1249, 1253 (11th Cir. 2004)) ("There can be no doubt that the request—made by an ineligible employee for leave that would begin when she would still have been ineligible—is not protected by the FMLA."). After that

26

date, Retamozo took two leaves of absence, first from October 1 to December 26, 2018 and then from October 1 through December 26, 2019. [Dkt. No. 80 at ¶¶ 20, 44.] No reasonable jury could conclude that U.S. Bank interfered with an FMLA benefit.

Nor did U.S. Bank interfere with Retamozo's FMLA rights by terminating her. [Dkt. No. 12 at ¶ 101.] Retamozo was terminated three and a half months after she returned from her second FMLA leave that ended on December 27, 2019. [Dkt. No. 80 at ¶¶ 45, 77.] No FMLA leave request was pending as of her termination in April 2020. *See Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 827–28 (7th Cir. 2012) (affirming grant of summary judgment on FMLA interference claim when employee was terminated two months after the employee requested and was granted one-day FMLA leave). Summary judgment is granted on Retamozo's FMLA interference claim, Count Four.

### E. Cross Motions on the Affirmative Defense of After-Acquired Evidence

U.S. Bank moves for summary judgment on its affirmative defense of after-acquired evidence. [Dkt. No. 75 at 15.] In her cross-motion, Retamozo moves for summary judgment on this defense. [Dkt. No. 83 at 24–25.] In an employment discrimination or retaliation case, the defendant-employer may assert an affirmative defense of after-acquired evidence to limit backpay damages. *See generally McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361–62 (1995); *see also O'Neal v. City of New Albany*, 293 F.3d 998, 1004 (7th Cir. 2002) (holding that the "after-acquired evidence that an employee misrepresented her qualifications in a job application or resume does not bar the employee's discrimination claim"). Under this defense, the

27

Court may use the date on which the employer discovered evidence of the employee's misconduct as the date at which backpay damages stop accumulating. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047 (7th Cir. 1999).

To get the benefit of this damages-limitation defense, an employer must "establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon*, 513 U.S. at 362–63; *see Sheehan*, 173 F.3d at 1048 (quoting *O'Day v. McDonnell Douglas Helicopter Corp.*, 79 F.3d 756, 759 (9th Cir. 1996)) (observing that the after-acquired evidence inquiry "focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not"). This limitation applies "even if [the information regarding misconduct] is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit." *McKennon*, 513 U.S. at 362. Although both parties move for summary judgment on the affirmative defense of after-acquired evidence, the employer bears the burden to prove by a preponderance of the evidence that the after-acquired evidence would have led to the employee's termination. *Sheehan*, 173 F.3d at 1047–48; *see also James River Ins. Co. v. Kemper Cas. Ins. Co.*, 585 F.3d 382, 385 (7th Cir. 2009) ("It is sensible to place the burden of proof of an affirmative defense on the defendant, rather than making the plaintiff prove a negative.").

U.S. Bank contends that Retamozo lied on her job application, and had it known this, it would have terminated her. [Dkt. No. 75 at 15.] In support, it relies on Cromwell's declaration, the person who interviewed, hired, and then supervised Retamozo until early 2019.[9] [Dkt. No. 75 at 2–3, 15.] In her employment application, Retamozo was asked: "If you have ever been discharged, suspended terminated, resigned without notice, or allowed to resign prior to termination in conjunction with previous employment, please describe the circumstances below (if not applicable enter 'n/a')." [Dkt. No. 74-48 at ¶ 3.] Retamozo responded that her then "current job" was with 21st Century Financial Services, LLC ("21st Century") and she did not provide a reason for leaving (or "N/A"). [*Id.*] Cromwell avers that had he known this information, he would not have hired her or alternatively, would have sought her termination. [Dkt. No. 74-48 at ¶¶ 6, 8.]

During discovery, U.S. Bank learned information about the circumstances surrounding Retamozo's prior employment with 21st Century, where Retamozo worked as a Regional Sales Manager. [Dkt. No. 80 at ¶ 5.] In August of 2017, an audit of Retamozo's expense reimbursement requests revealed that she had submitted

---

[9] The Court rejects Retamozo's argument that U.S. Bank violated Fed. R. Civ. P. 37(c) in its initial and supplemental disclosures. [Dkt. No. 83 at 25.] Retamozo identified Cromwell in her Rule 26 disclosures, and U.S. Bank subsequently provided Cromwell's contact information. [Dkt. No. 89 at ¶¶ 1–2.] The Court likewise rejects the argument that Cromwell's declaration contradicts his deposition testimony. [Dkt. No. 83 at 24.] In his deposition, Cromwell testified that he "may have seen" Retamozo's application, but he does not "remember" as it been a "long time" since he had seen it last. [Dkt. No. 86 at ¶ 98.] This evinces a lack of memory, not a contradiction. *See Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1210 (7th Cir. 1993) (holding that "[a] fact-finder could not reasonably infer from [plaintiff's] statements, taken as a whole, that" a certain fact was disputed because the alleged dispute was founded on "what [plaintiff] admits to be a faulty recollection" which is "not sufficiently probative").

fraudulent expense reimbursement requests. [*Id.* ¶ 6.] 21st Century informed Retamozo that it was aware her mileage records were not "accurate," and Retamozo submitted a letter of resignation that same day. [*Id.* ¶ 7.] Retamozo admitted to these acts and omissions at her deposition. [Dkt. No. 80 at ¶¶ 8, 12–13.]

The sole piece of evidence on which U.S. Bank relies—Cromwell's declaration—is too thin to support summary judgment in Defendant's favor. Courts in this district have declined to grant summary judgment on the basis of declaratory statements alone. In *Lalowski v. Corinthian Schools, Inc.*, the defendant-employer asserted an affirmative defense of after-acquired evidence based solely on a declaration that, had it discovered plaintiff's failure to include all employers on his resume (including an employer that terminated the plaintiff), it would have fired the plaintiff. 10 C 1928, 2013 WL 1788353 at *8–9 (N.D. Ill. Apr. 26, 2013). The Court declined to find this submission satisfied the preponderance of the evidence, noting that the employer needed to establish that their "decision to terminate not only would have been justified, but also would have occurred." *Id.* at *9. When an employer merely asserts that an employee would have been fired after the relevant discovery but fails to "present any evidence that in the past they have fired other employees for such conduct," an after-acquired evidence defense is appropriately rejected. *Id.*

Aside from the declaration, U.S. Bank does not provide any documents such as an employee handbook, spelling out applicable policies that might be helpful (though are not dispositive) of the issue. Nor has U.S. Bank provided historical evidence of firing employees who made similar misrepresentations on employment applications.

*See Sheehan*, 173 F.3d at 1047–48 (affirming summary judgment in favor of employee where "no one in the history of [the company] had ever been fired for" the misconduct at issue, and where employer failed to produce evidence that a relevant policy would have been applied). Absent that kind of information, summary judgment for U.S. Bank is not warranted. Accordingly, the Court denies U.S. Bank's motion for summary judgment and grants Retamozo's cross-motion on the same grounds.

## IV.    Conclusion

For these reasons, U.S. Bank's summary judgment motion is granted in part and denied in part. [Dkt. No. 73.] Summary judgment is granted on Retamozo's ADA failure to accommodate claim and FMLA interference claims, Counts One and Four respectively. Summary judgment is denied on Retamozo's retaliation claims under the FMLA and the ADA and her disparate treatment claim under the ADA, Counts Two, Three, and Four. U.S. Bank's motion for summary judgment on after-acquired evidence is denied; and it is granted in favor of Retamozo as to that affirmative defense.

Enter: 21-cv-1652
Date:  August 18, 2023

_____
Lindsay C. Jenkins
United States District Judge